Good morning, Your Honors. Amy Field on behalf of Defendant and Appellant Jeffrey Nolte. Your Honors, this case presented a classic situation where an officer was entitled to qualify to meet an unexcessive force charge. Officer Nolte was forced to make a split-second decision. That's an interesting point, the split-second decision. I was comparing this in my mind to a case that we issued called Billington. It's a split-second decision case. But in this one, it looks like the policeman's story was not, I had to make a split-second decision. It all happened too fast for me to really be sure whether he had the gun or not. The policeman said, I saw the gun, it was pointing at me. And the jury says that's not true. My thought was it was a miracle to be able to shoot the gun out of the guy's hand without any pellets hitting the gun and damaging the gun and without any tissue getting on a gun. It's the ultimate trick shot. It looks like the split-second defense is a good defense under Billington, but it's not the story that the police told. How do we plug it back in this late in the day? Well, Your Honor, I believe that the evidence showed that Officer Nolte said he saw, when he walked into that room, when Robinson first came into his sight, he saw Robinson holding the gun aimed at him. Yeah, so I'm sorry. I realize what the argument is. I've read all your briefs, but that's not what the jury found in the special verdict. And I'd like you to explain that. Well, the jury found, as a factual matter, that your client shot a man who was lying in bed in the middle of the night with his arms raised, and that the physical evidence corroborates that story, that there's no blood or tissue on the gun. Yes, the gun was nearby. But even your own client testified that the gun being within reach does not justify the act of shooting him. I read this case and I wondered, and I hope you'll go back to City Attorney Delgadillo and tell him that I wondered, why in the world you are still fighting this case? What a waste of city resources. This is unbelievable. You have a jury verdict. You come in, now you've got a third and fourth version of the facts that you're trying to argue to us, when the jury verdict and Judge Manilla, who's an excellent judge, has made findings, factual findings, exactly against you. Don't you have conferences where you say, why are we going to pursue this case? It just seems ludicrous to me. Just a waste of the city's money. I'd like to respond to that, Your Honor. Obviously, I see the record quite differently. The jury was not given special interrogatories, so I think we're making a tremendous leap to find that the jury necessarily found that Nolte didn't see Robinson holding the gun. That was not the way the case was argued to the jury. There was absolutely no evidence to refute Officer Nolte's testimony that when he first laid eyes on Robinson, Robinson was holding that gun and aimed at him. His testimony was consistent with Robinson's own testimony that half a second to two seconds before his injury, that's, in fact, what he was doing. That was Robinson's very own testimony. But what the district court said was that the jury answered yes to the special verdict forum question, did Defendant Jeffrey Nolte violate the plaintiff's constitutional right by using excessive force when he fired at the plaintiff? That necessarily rules out a jury belief that Officer Nolte was testifying truthfully that the gun was in the defendant's hands. I don't believe it does, Your Honor, and let me explain why. There weren't any jury instructions in this case? The jury instructions all, unfortunately. Your Honor, this case was the motion for summary judgment was brought presacie. This was all as the law on qualified immunity in the circuit was developing or redeveloping. The trial was held right as sacie was being decided, and I think everybody was struggling with it. The jury was instructed on the sacie. I read Judge Cannella's opinion. I don't think she's struggling with it at all. I don't see the sacie problem, actually. It seems to me the point that the man had the gun when he heard the noise initially is no benefit to the police and no detriment to the plaintiff. People lying in bed at night fearing intruders may have a legitimate reason to be prepared to defend themselves. Once the police say police or drop it and raise your hands, well, once a man drops it and raises his hands, the cop can't shoot him. I'd like to respond to that, Your Honor. The point I'm trying to make is that the evidence is unrefuted that Nolte saw Robinson with the gun in his hand. Robinson couldn't refute that. Oh, it is refuted. There were two different stories. Robinson says, I put the gun down and my hands were raised. The policeman says he had the gun in his hands and he was pointing it at me. The physical evidence says it has to have been a miracle if the policeman's story is true, because Robinson's hands are all shot up, but the gun is untouched and has no tissue on it. So the jury believes Robinson. I don't understand what you mean that it's unrefuted. The jury believes Robinson, Your Honor. What do you mean unrefuted? Are you saying that Robinson didn't testify? Did I misunderstand you? No. I'm saying that Robinson could not and did not, nor could the experts testify as to who saw who first. And Officer Nolte's testimony was entirely consistent. If Robinson says, I did not have the gun in my hands when the policeman came around the corner. When I saw the policeman. I mean, this is happening like this. Nolte saw him first. Why do you call that unrefuted? It seems to me as though the only way you can call it unrefuted is if you say, I only count policeman's testimony. I don't count plaintiff's testimony. No, I'm saying it's unrefuted because it's unrefuted. If Robinson had testified, I never had the gun in my hands, my gun was over in my gun rack, and Officer Nolte had said, I saw him holding the gun, then I think Robinson's testimony. You know what? That's the difference here. Robinson was telling the truth. He heard noises. He feared something. He got his shotgun, and he had it, and when the police said police, he put it down in his lap and raised his hands, knowing otherwise he could be shot. He was a security guard. This story is the one, if you're asking me to put myself in the place of the jury, that's the story that rings true, not the three or four different stories that the City of Los Angeles has told since. For purposes of the argument, let's assume that the way the Court views it is correct, that Nolte's testimony that he saw the gun in the hand in a split second was refuted by Robinson's testimony. I don't believe it was, but let's assume that. Maybe we're having trouble with it. Let's say disputed. Maybe you mean refuted categorically, like you can't believe it. It was certainly disputed. You can say that. You would concede that it was disputed? It was disputed by conjecture, Your Honor. Why is it conjecture? I mean, I'd like to refer to. We're just not connecting, I guess. I don't understand why it's unrefuted or disputed only conjecturally. Because nobody could say. The experts couldn't say. Nolte couldn't. I'm sorry. Robinson couldn't say. Oh, I get it. You're saying this is like when you ask the witness a question, the answer would hurt him, and he says, I don't remember. And obviously he remembers and he's lying. And you're saying, well, no, nobody can say what's in his memory. The policeman's saying, nobody can say what I saw. I don't believe I am saying that, Your Honor. But it doesn't follow, because you can say what he saw if he claims to have seen something that's impossible for him to have seen at that instant. If it was impossible. It wasn't impossible for Nolte to have seen him first and Robinson to have laid the gun in his lap. And Nolte has a split second to make this decision. I'm standing in a room. But you didn't present a split second theory. When the policeman's story was not, it all happened so fast. The policeman's story was not, it all happened so fast that I was shooting as he was putting the gun down. It was. No, it was I was shooting and I believed he was still holding the gun. And the qualified immunity. He was pointing the gun at me and I shot at him.  And the qualified immunity analysis requires that you look at it from the perspective of the reasonable officer. And the reasonable officer is allowed to make. That's where the miracle trick shot comes in. The reasonable officer is allowed to make mistakes in perception. If he believed he was still holding the gun, he didn't see him. He should have said it again in that split second. Here's the problem I have with the case. And that is. And the reason why at the moment I'm currently inclined to simply affirm the judgment. And that is if the officer had said it all happened so fast. I came around the corner. I had been warned he was going to have a gun. I was afraid. I glimpsed the gun. I saw him and I shot because I was in fear for in reasonable fear for my life. I think he might have qualified immunity. But he didn't say that. He said something quite different. He got two officers to corroborate that testimony under circumstances where it would have been very difficult for those officers to have seen what he saw. Can you tell me. Did he make some recorded statement shortly after the event. Consistent with his testimony at trial that he couldn't walk away from. Is that what happened. I believe he did. And I believe to this day. Because the officer. No, he would still because the different judge told him, here's a story that will work for you. And he didn't tell the story. But I guess he was stuck with his earlier story. Is that what happened. He was stuck with telling what he believed to be the truth. How did he shoot the gun out of the guy's hands without any damage to the gun and without any tissue or blood on the gun. Even though the hands were all chopped up by the shotgun blast. He made a mistake. No, I'm not talking about that. Now I'm talking physically. How can you explain the gun being clean when the hands are all chopped up by the blast if the gun is in the hands. I don't think you can, Your Honor. I think somewhere in that. If you can't explain it, the policeman's story is physically impossible. So I'm asking you, give an explanation that could allow the policeman's story to be the truth. Show me how you get a gun with no damage to it from the shotgun pellets and no tissue or blood on it. So the gun is in the man's hands and the policeman fires the shotgun blast, which chops up the suspect's hands. Do you understand my question? I do understand your question. My thinking is it's a great trick shot to shoot a gun out of somebody's hands. To do it where you chop up the hands but you get no blood on the gun, that approaches the point of being a miracle. I'd like to answer the Court's question and then I'd like to make another point if I may. This is my explanation and this is what I believe happened and I believe this is supported by the evidence. Officer Nolte rounds the corner of that refrigerator. He sees Robinson before Robinson sees him. He sees him with the gun in his hand. By Robinson's own testimony, he lays the gun down in his lap. By that point, Officer Nolte has already reasonably feared for his life and made the decision to fire his own weapon. He fires it and by that time, the hands are off the gun and there's the damage. I get it. So the explanation that would make sense of it is simultaneously Robinson's dropping the gun while the policeman is squeezing the trigger. I believe so. Fast hands, slow bullets. I think we're talking by everyone's testimony that this all happened within a split second. And, you know, we can sit there and say, you know, there was no expert testimony on this, but I'm sure you could find an expert to talk about how fast, you know, the reaction time between the time you see something and the time you pull the trigger and the time the bullet travels. How come you didn't bring that in at trial? I'm sorry? If that's your story, why didn't you prove that at trial? In a qualified immunity analysis, the court is required to look at the objective facts and I believe I am arguing the objective facts. But the second point I want to go on to is I kind of feel like I'm butting my head against a wall. Let's talk Katz. As I recall Katz, what you're supposed to do at the first step is assume that what Robinson says is true. Would there be a constitutional violation? Well, yes. If the man's put down a gun and raised his hands. Then the next step is would a reasonable policeman know and that sort of thing. And is the law well established? In this case, I don't understand how your Katz analysis gets you home. I disagree with the Court respectfully that even if we accept that at the moment Nolte saw Robinson, his gun was in his lap, that it's an automatic win for the plaintiff. I think any officer under those facts standing 8 to 10 feet away from a man with a loaded shotgun in his lap, not on the floor, not in the gun rack, in his lap, and the scene is moving. I mean, by plaintiff's own testimony, his experts, no one could say, all they could say is he's doing this. Let me ask you about a couple. That he would reasonably fear for his life. If we were to go your way, does that mean that in future cases when a cop said drop it and raise your hands and a suspect dropped it and raised his hands, the cop could shoot him anyway and have qualified immunity? I don't think this officer had time to say drop it and raise your hands. I think another fundamental difference between this case and some of the other cases where excessive force has been found in a shooting situation is the officers doing the shooting and making the decision from a safe vantage point. You know, in the Harris case, he's up on the hill safely ensconced, I think were the words of the Court, watching this man who's already killed another law enforcement officer. They're safe. The problem that I'm having with the idea of the gun in his lap is he's lying in bed and it's nighttime and there's noise. And it strikes me as legitimate for a person to have a gun in his lap for self-defense. I'm thinking. But, Your Honor, I think what we're doing right now when we talk about that is we're looking at it from the perspective of the civil rights claimant. And the law is very clear that we have to look at it from the perspective of the reasonable police officer. Right. But the reasonable policeman has to know that people fearing intruders may have guns. See, this is the problem. This is where I think we're in disagreement. I agree with you. There's an objectively reasonable standard. But we have facts in this case that were proven. So we have to apply that standard to the facts. And I think the district court laid it out really well, that there were two wholly contradictory versions of the facts presented at trial. The jury chose to believe one. And that you argued before her that you're hypothetical. Well, it could have been that Robinson was in the act of removing his hands from the gun when Nolte, in a split decision, shot him. But her problem with it is the same problem I have with it. That was never presented to the jury.  Those are not the facts that we apply the test to. We have to apply the test to the facts as found by the jury that, under that factual scenario, would a reasonable police officer clearly believe that taking that shot was not precluded by a clearly established law. And, you know, I think the district court says that rather clearly. She says, rather, the question is whether an officer could reasonably have believed it lawful to shoot a man lying in bed with his arms raised beside his head, some two feet apart, palms open, fingers spread in a classic surrender position because a gun was in reach. Now, have you cited any cases that say that would have been objectively reasonable under the Saussure-Katz test? Your Honor, no, I don't believe I have. And I don't think it would be, do you? No, I don't think it would be. But that's not the evidence presented here. The experts. Well, you just put your finger on it. I think that's where my fundamental disagreement is with your position. I think we have to go by what the jury found. Those are the facts. You told one story at trial. Ronson told another story. It's an argument. And now there's a third story. Well, how do we know what the facts are except through our jury system? They found the facts. I think we have to look at the transcript. And, you know, as I stated in my brief, I don't think that the lying supine on the bed, arms spread apart, 24 inches apart in a classic surrender position was ever testified to by anyone. That was a possible scenario. That was what he testified to, what Robinson testified to at his prelim. But he backed away from that at the trial. And there was no finding by the jury that that's where he was. The way the case was argued to the jury, and I cited some of the sections of Mr. Epstein's argument in my brief, and in rereading his closing argument, I mean, again, he kept arguing that it came down to a simple question. If Robinson's hands were somewhere off the gun and he said it could be here, here, or here, or here, anywhere, it didn't matter, as long as Robinson's hands were somewhere off the gun at the point Nolte shot him, not at the point Nolte saw him, at the point he shot him, then we win. That's all you can infer from that. I don't think you're arguing qualified immunity. I think you're re-arguing the case to the jury. Well, well, I believe I was asked what we could infer from the jury's finding, and I'm just saying there was no evidence to support that there was a finding, a factual finding by the jury that Mr. Robinson was lying supine on the bed with his arms, hands in a classic surrender position. That simply wasn't the testimony. You're saying we should set aside the verdict because there was no evidence to support  That's not a qualified immunity argument. I understand that, Your Honor, but we're in this kind of awkward But you didn't make the argument in your brief that we should set aside the jury verdict because there's no evidence for it. My argument is Well, I see what you're saying to help you out here. What I was saying is we have a jury verdict that went that way, but the standard for under associate versus case is we take the facts in the light most favorable to plaintiff. So the statement about the 24 inches apart or whatever is all supported by evidence in the record, and it's also the facts in the light most favorable to the plaintiff, which is what we have to take for our qualified immunity analysis. And those are you're right. There wasn't a specific finding on the 24 inches apart, yet. That's all supported by the record. It's also supported by the jury finding. And that's my point, Your Honor, is that I don't believe it is supported by the record. If you go back and you do the testimony in the place They should have made a motion for a new trial or appealed on the basis of insufficient evidence. This is a qualified immunity case, and I believe that, you know, that challenging the court's finding at every step of the way on qualified immunity is the appropriate argument to make. And I'm kind of watching my time, and I did want to get back to a point that You ran through it, but go ahead and take another few seconds and wrap up. Okay. When it's red, that means your time is telling how much you're over time. I'm sorry. Okay. Thank you. You were asking, you know, shouldn't the officer know that anybody who is lying in their bed is going to, you know, intend to, you know, or likely, you know, try and protect themselves against an intruder? And my response to that, Your Honor, is that it's, again, looking at it through the eyes of the claimant instead of the officer. And I would just point out in the Billington decision from this Court, the language contained in there where there was a factual dispute about whether at the point the officer shot the suspect, whether they were still, you know, locked in this hand-to-hand combat or whether they had stepped away from each other, and the Court's judgment simply wanted to disarm him when he was grabbing at the officer's gun, not shoot him. But that would have been a gamble, and a gamble that the law does not require the officer to take. This officer, maybe he could have supposed. There's a big distinction. The fight was still going on. Billington and the policemen were still fighting for who was going to win this deadly confrontation. In this case, the jury has decided the fight is over. The testimony that the jury evidently bought was Robinson's, that he dropped the gun and raised his hands. And Billington didn't do that. I know the Billington record line by line. Well, my response to that, Your Honor, would be that the officer was still confronting an armed man at a very close range. Mr. Robinson had not been armed himself. Look, armed man, I know a superior court judge in my town. He and his wife were awakened by a noise in the bedroom. He picked up his shotgun from under the bed. He cocked it, and he said, may I help you? And the man at the foot of the bed ran away. That's a perfectly legitimate thing for him to do. If the man at the foot of the bed had said, police, drop it, he would have. And then it would have been wrong for the policeman to shoot him. Mr. Robinson didn't drop the gun. He didn't disarm himself. He could have thrown it across the room. He could have done a lot of things. He laid it in his lap, and Officer Nolte had two seconds, half a second to two seconds, to figure out what to do. Thank you, counsel. Thank you, counsel. Thank you. Good morning. Counsel. My name is Jim Epstein. Myself and Mr. Fyke were the attorneys for Mr. Robinson. As you know, I was also Mr. Robinson's trial attorney way back in 1997 when this preliminary  There are many aspects of the trial that I would like to highlight. The allegations by the city attorney in their brief, which I have to address, and also their oral argument. They said that Mr. Robinson backed away from his testimony at the preliminary hearing at the trial. They argued that to you. At no time did he ever back away from his testimony. The city attorney didn't attempt to point out anything in the record where he backed away. I asked Mr. Robinson to show me what happened in this case, and it's all in the record. At the preliminary hearing, I put him on the stand, and I asked him to demonstrate what happened. And it was actually read to the jury from the preliminary hearing, it's all in the record, Mr. Robinson sitting in a witness chair put his hands up like this. And then this is the testimony read to the civil jury from the preliminary hearing. Answer, this is the bed in the position from the corner to corner. I am lying on the corner of the bed at the time, he said, when I heard him say police. The door was entering, I was lying back as such, indicating like that. Question, so the position you are in now was the position you were in at the time the gun was fired the first time? He's like this, he says, yes, but. But I was laying down, not completely, just part of my back was raised up. So he says, I was like this, but I was lying back. And what happens when someone like this is lying back, which he couldn't do in the witness chair, your hands go back, your fingertips are now facing behind you, and your wrist is now closer to the officers than your fingertips, aren't they? That was his testimony. And then I said, for the record, the defendant is leaning back in the witness chair with his hand extended in front of his body, palms forward at that time, with his hands approximately the height of his head. The court, all right. Mr. Lamb, the district attorney, I would say that there appears to be about a 20 to 24 inch between the hands. The court, all right. So that's where the 20 to 24 feet came from. But again, Mr. Robinson said I was lying back. At the trial, he was allowed to lay on the floor in front of the jury and demonstrate again, which showed that his fingers were behind him, okay, facing behind him, wrist towards the officers. At no time did he ever back off that testimony, ever. And the most pertinent physical evidence in this case, besides the obvious lack of blood, lack of damage to the gun, is the fact that every expert, Dr. DeMille, who was called by the people in defense in a civil case, Dr. Forrester, who was called by the prosecution in the criminal case, and Mr. Dougherty, called by us at the civil case, all agree that based on the x-rays, the direction that the pellets from the officer's gun hit Mr. Robinson's hand was about a 45 degree angle, which would be from the hallway this way. And it hit near the base of the hand, near the wrist. And the pellets moved towards the pinky side of the hand, which is consistent with firing like this. And from the wrist towards the fingertips. On rebuttal, let the city attorney explain how conceivably Mr. Robinson's hands could have been anywhere but like this and have the pellets hit the wrist first and go towards the fingertips. If he's reaching towards the gun in any way, the pellets will hit the fingertips first and move towards the wrist. How did the thumb get shot on the other hand? The evidence was that after Mr. Robinson was hit in the right hand, he tried to jump off the bed as fast as he could, throwing his left hand behind him like this. In the testimony of Doc, there was damage to the bedspread, perfect parallel to the damage to the end table, showing that Officer Nolte fired the same gun in the same position, but further north in the room. The damage to the bedspread was further into the room than the damage on the coffee table, which the pellets hit after hitting Mr. Robinson's right hand. Mr. Dougherty testified the evidence was there was no pellets whatsoever in the bed or in the bedspread. They all ricocheted off. It was Mr. Dougherty's testimony that he believed that when the first pellets hit the bedspread, they were slowed down by the hitting the object. The ones behind it crashed into those, which made them ricochet up, and that Mr. Robinson's left hand got hit by the second shot as he was flying off the bed. A pellet went through his thumb of his left hand as he was going off the bed. That was the answer to that question. Was Mr. Robinson prosecuted for the cocaine that was found in his room? Yes, he was prosecuted for possession of cocaine and possession of a gun, but under that law, the gun could be anywhere in the house, anywhere in the room, and he was convicted by the jury of that charge. All right. So the people in their brief at page 22 of their opening brief say, quote, the court's characterization of the events was also at extreme odds with Officer Nolte's testimony and unsupported by Robinson's own testimony, the expert testimony, and the physical evidence. Well, that's quite a claim. They never, ever in the brief, ever then discussed the physical evidence, not one bit of it. They make the bold claim that it didn't support the judge's finding, but they never discussed it. They claim that the expert testimony did not support Judge Menlo's factual finding. Did you have Officer Nolte sort of stuck with earlier recorded version of this event? Is this why this transpired in the way it did? What happened is that within four hours of the shooting, the officers had to make a statement to the officer involved shooting team, and all the officers committed themselves to this story that Mr. And that was before the officer knew the physical evidence, because the physical evidence was not known to the officers four hours after this happened. And they all committed themselves to this exact story four hours after this happened. Okay. So just looking briefly at this claim, that first they claim that it was totally inconsistent with Nolte's testimony. Well, so be it. That's, of course, correct. All right. What they don't put in, which is kind of interesting, is it was also totally inconsistent with Kozak's and Chavez's testimony. Why don't they mention that? Because they're trying to claim this is just a reasonable mistake by Nolte. That's hard enough to argue, but they have to say that Chavez and Kozak made exactly the same mistake. It's just off the hill. Plus the fact that the evidence was clear that Chavez couldn't have been anywhere close to this situation. He was the fifth man in the room, in the apartment, lined up outside the hallway, had to move down the hallway to get in the door. Yet he claims that between the first and second shot, he sees my client trying to move the four-stop with his left hand twice between the shots. This was obviously a totally fabricated story by three officers who got together and made up a story. If Nolte really believed in his mind that he made a mistake, then why in the world would he get together with the other officers and get them to corroborate this story? That makes no sense whatsoever. Now, the testimony of Robinson, I've already gone through the preliminary hearing. It's totally consistent at the preliminary hearing and at trial with the fact that his hands were up away from the gun. And he testified at page 292 of the appellate's record, excerpts. He says there was no question in his mind that his hands were well off the shotgun when he first saw Nolte. It's in the record. His hands were well off the shotgun when he first saw Nolte. Page 292 comes up and says, well, Nolte saw Robinson before Robinson saw Nolte. Where's the evidence of that? Robinson is looking right at the hallway where it breaks into the room because he knows someone's coming down. How in the world would Nolte see Robinson before Robinson saw Nolte? It makes no sense whatsoever. Nolte has to clear the refrigerator and look around for somebody. That makes no sense whatsoever. In their brief, the appellate claims that Robinson could only say his hands were off the gun and could not say how far his hands were from the gun. If you check the citations that they give to you, he never says that. It's nowhere in there that he says, I don't know how far off the gun my hands were. Now, Mr. Dowdy, the people actually not only misrepresent what Mr. Dowdy said in his brief, they give you false, they leave out the critical testimony of Mr. Dowdy. In their brief, they claim that expert testimony does not support the judge's findings, the hands were like this. And they argue at page 25 of their opening brief, quote, Dowdy could only say that the physical evidence was consistent with Robinson's hands being somewhere off the gun. Study in page 276 and 277 of the excerpts. That's all he could say, they said. If you read those pages, 276 and 277, nowhere does Mr. Dowdy say, that's all I can say. What they totally left out in their argument was a testimony of Dr. Mr. Dowdy at page 28 and 28A of the Apollese excerpts, which were as follows. My opinion, this is Mr. Dowdy, my opinion is that his hands were away from his torso and away from his body, and they were in line with the shot column in such a way that the shot column would travel across and hit the palm and then travel up to the fingers. Question, let me ask you more specifically. You read Mr. Robinson's testimony at the preliminary hearing, yes. At the preliminary hearing, did he state that when he raised his hands, answer right. Question, and did he say he was laying back at the time? Answer, yes, he did. Question, as I stand here with my palms up, as I lean back, does that put my fingertips towards the rear of me? Answer, that does. Question, and if Mr. Robinson was in this type of position where he is leaning back and, therefore, his fingertips are facing backwards, would that be consistent with the physical evidence in this case? Yes, it would. And the position of the people is that Dowdy's testimony did not support our position, Judge Minello's position, and they argued to that, and they totally left that out in their excerpts. I know this might seem off, really off, but I'm curious, where was this hotel located? It was an El Segundo Boulevard just west of the Harbor Freeway. And we're talking 1997 or 98? 97, June 18th, 1997 was the date of the incident. So their arguments in their brief that the finding by Judge Minello that the hands were up, that it was unsupported by Robinson's testimony is totally false, as I've shown you. Their testimony that the expert testimony did not support that position is totally wrong and incorrect, as I just put it out to you, and their testimony that the physical evidence did not corroborate that finding, again, is totally wrong and misleading. And the most important one, really, is the direction of the fingertips. The lack of blood, the lack of damage to the gun certainly proves the hands were off the gun, but it's the direction of the pellets hitting the wrist first and going towards the fingertips that proves that it wasn't even reaching towards the gun. It had to be way back in this position for that to conceivably happen. And perhaps the city attorney can give you a demonstration how that physical evidence could be in this case if his hands went so far back that the fingertips were now facing behind him and the wrist is now closer to the officers. If Mr. Robinson had been reaching forward, he would have been shot in the torso because his hands would be in front of his body. The only reason why he wasn't shot in the body was the hands were out, and one came like this, and the other one, as he went off the bed, caught the thumb of the left hand going off the bed. This is not a case where the officers were confronted with someone they believed was dangerous. The evidence shows this was a search warrant for drugs only. There's absolutely no evidence that they had any information that Mr. Robinson was dangerous other than the fact that he had a gun, and in fact, and it's in the testimony here. I'm pushing it a little in my mind. I mean, for one thing, anybody is dangerous if you confront them in their home at night. And for another, people who engage in some sort of felonious behavior are likely to be a little more dangerous because they get a little less protection from the legal system and have to furnish more of their protection themselves. I agree with that, but I'm simply saying that this is not a case where sometimes it's put in the back that the officer had information that he was a very dangerous, violent person. They had information that gave them the warrant. They had information that he had one, that he had a gun. Did they have information that he had two guns, or did he say that he was armed? The informant said that he believed he had two guns in the apartment. But he also told the officers, and it's in the record and I have it here, that he told the officers he did not believe Robinson would ever use a weapon against these officers. So they have that information. And that's in the testimony. Where is that? I'll tell you in a second where it is. Here it is in the appellate's excerpts on page 257. The informant told the officers that in his opinion, Robinson would not use his weapon on a peace officer, page 257. So in fact, despite the claim by the appellate in this case, Mr. Robinson's testimony, the physical evidence, the expert testimony in this case all not only corroborate Mr. Robinson, but prove beyond a reasonable doubt that his scenario was correct. You have the three officers in this case, and we know that Mr. Robinson was very lucky to get the physical evidence, because if there was no physical evidence, if all the jury in the criminal case had was the fact that three officers swear that Mr. Robinson was holding the weapon, and Mr. Robinson said, no, that's not true, we all know Mr. Robinson would be in prison right now, facing up to 22 years in prison. But fortunately for Mr. Robinson, there was physical evidence that totally discredited these officers in this testimony. If the Court has any other questions whatsoever, I'd be glad to answer them. Thank you, counsel. Thank you. Robinson v. Nolte is submitted.
judges: Kleinfeld, Wardlaw, W Fletcher